

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-20-2005

# Auguste v. Secretary Homeland

Precedential or Non-Precedential: Precedential

Docket No. 04-1739

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Auguste v. Secretary Homeland" (2005). *2005 Decisions.* Paper 1534.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/1534

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 04-1739

———

NAPOLEON BONAPARTE AUGUSTE,

Appellant

v.

THOMAS RIDGE, SECRETARY, UNITED STATES
DEPARTMENT OF HOMELAND SECURITY; JOHN
ASHCROFT, ATTORNEY GENERAL OF THE UNITED
STATES; MICHAEL GARCIA, ASSISTANT SECRETARY,
BUREAU OF IMMIGRATION AND CUSTOMS
ENFORCEMENT (BICE); ANTHONY S. TANGEMAN,
DIRECTOR OF DETENTION AND REMOVAL, BICE; JOHN
CARBONE, DETENTION AND REMOVAL FIELD OFFICE
DIRECTOR - NEW JERSEY, BICE; MICHAEL T. ABODE,
WARDEN, MIDDLESEX COUNTY ADULT CORRECTIONS
CENTER.

———

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 04-cv-01094)
District Judge: Honorable Joel A. Pisano

———

Argued November 1, 2004

Before: ALITO, FUENTES, and BECKER, Circuit Judges.

(Filed: January 20, 2005)

Robert W. Brundige
Renee C. Redman (ARGUED)
Sarah Loomis Cave
Laurence Burger
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004

The Legal Aid Society
Janet Sabel, Supervising Attorney
Immigration Law Unit
Bryan Lonegan, Of Counsel
199 Water Street
New York, New York 10038

ATTORNEYS FOR APPELLANT

Christopher J. Christie
United States Attorney, District of New Jersey
Stuart A. Minkowitz (ARGUED)
Assistant United States Attorney, District of New Jersey
970 Broad Street, Suite 700
Newark, New Jersey 07102

Robert D. McCallum, Jr.
Assistant Attorney General
Margaret Perry
Senior Litigation Counsel, Office of Immigration Litigation
U.S. Department of Justice, Civil Division
P.O. Box 878, Ben Franklin Station
Washington, DC 20044-0878

ATTORNEYS FOR APPELLEES

———

OPINION OF THE COURT

———

FUENTES, <u>Circuit Judge</u>.

Napoleon Bonaparte Auguste appeals from the District Court's denial of his petition for writ of habeas corpus seeking relief under the United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (the "CAT" or "Convention"). Auguste, who is facing removal to Haiti, claims that he will be indefinitely detained upon his arrival in Haiti in prisons that are notorious for their brutal and deplorable conditions that have been compared to those existing on slave ships. There is no doubt that the prison conditions that Auguste and others like him may face upon their removal to Haiti are indeed miserable and inhuman. However, because we hold that in order to constitute torture, an act must be inflicted with the specific intent to cause severe physical or mental pain and suffering, the standard the President and Senate understood as applying when the United States ratified the CAT, we find that Auguste is not entitled to relief. Accordingly, we will affirm the decision of the District Court.

## I. Background

Auguste, a twenty-seven year old male, is a native and citizen of Haiti who was admitted to the United States as a lawful permanent resident on December 8, 1987. His entire family lives in the United States. On April 4, 2003, Auguste was convicted of Attempted Criminal Sale of a Controlled Substance (cocaine) in the third degree in Queens County, New York, and sentenced to ten months imprisonment.

On July 3, 2003, the Department of Homeland Security, Bureau of Immigration and Customs Enforcement, issued a notice to appear charging Auguste with removal on two grounds: (1) as an alien who has been convicted of a controlled substance violation pursuant to § 237(a)(2)(B)(i) of the Immigration and Nationality Act (the "INA" or "Act"), 8 U.S.C. § 1227(a)(2)(B)(i), and (2) as an alien who has been convicted of an aggravated felony/attempted drug trafficking crime pursuant to § 237(a)(2)(A)(iii) of the Act, 8 U.S.C. § 1227(a)(2)(A)(iii).

Auguste did not contest his eligibility for deportation as charged and instead, as his defense, applied for deferral of removal under the CAT and its implementing regulations. With regards to his claim for relief under the CAT, Auguste argued that he was entitled to a deferral of removal on the grounds that he faces torture in Haiti because, as a deported drug offender, he will be detained by Haitian authorities for an indeterminate amount of time in harsh and intolerable prison conditions.

## A. Conditions in Haitian Prisons

Since at least 2000, it has been the policy of the Haitian government to detain deported Haitians, who have incurred a criminal record while residing in the United States and who have already served their sentences, in preventive detention. The policy appears to have been motivated by the belief that criminal deportees pose a threat of recidivist criminal behavior after their return to Haiti. The length of the detention can vary, lasting in many instances upwards of several months. Auguste contends that release often depends on the family members of the deportees petitioning the Haitian Ministry of Interior for release and their ability to pay anywhere between $1,000 to $20,000.

Documentary evidence submitted by Auguste in support of his CAT claim describes the brutal and harsh conditions that exist in the Haitian prison system. We recount briefly some of these conditions. The prison population is held in cells that are so tiny and overcrowded that prisoners must sleep sitting or standing up, and in which temperatures can reach as high as 105 degrees Fahrenheit during the day. Many of the cells lack basic furniture, such as chairs, mattresses, washbasins or toilets, and are full of vermin, including roaches, rats, mice and lizards. Prisoners are occasionally permitted out of their cells for a duration of about five minutes every two to three days. Because cells lack basic sanitation facilities, prisoners are provided with buckets or plastic bags in which to urinate and defecate; the bags are often not collected for days and spill onto the floor, leaving the floors covered with urine and feces. There are also indications that prison authorities provide little or no food or water, and malnutrition and starvation is a continuous problem. Nor is medical treatment

provided to prisoners, who suffer from a host of diseases including tuberculosis, HIV/AIDS, and Beri-Beri, a life-threatening disease caused by malnutrition. At least one source provided by Auguste likened the conditions in Haiti's prisons to a "scene reminiscent of a slave ship."

There are also reports of beatings of prisoners by guards. State Department reports on conditions in Haiti in 2001 and 2002 discussed police mistreatment of prisoners and noted that there were isolated allegations of torture by electric shock, as well as instances in which inmates were burned with cigarettes, choked, or were severely boxed on the ears, causing ear damage. The authorities' record of disciplining police misconduct was, however, inconsistent.

The Department of State reported that Haiti remains a "very poor" country, and that the prison system operates at or near the same budget level as in 1995. Despite attempts at increasing the budgetary allocation for prisons, political instability in Haiti was expected to cause a continuation of budgetary freezes.

### B. The Convention Against Torture

Auguste seeks protection under Article 3 of the Convention. See Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 3, opened for signature Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. 85 (entered into force June 26, 1987). Because the history of ratification of the Convention by the United States will prove relevant to resolving Auguste's habeas claim, we recount that history in some detail.

The CAT was adopted by the United Nations General Assembly on December 10, 1984, with the stated purpose to "make more effective the struggle against torture and other cruel, inhuman or degrading treatment or punishment throughout the world." See Preamble to Convention, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85. The CAT represented a continuing process in the codification of an international legal norm condemning the practice of torture by public officials, a norm first recognized in several

prior multilateral agreements.[1]  As the preamble to the CAT recognizes, it is the obligation of nations under the United Nations Charter to "promote universal respect for, and observance of, human rights and fundamental freedoms."  See Preamble to Convention, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85.  Since opening for signature in December 1984, over 130 countries have signed and/or become parties to the Convention.[2]

Article 1 of the CAT defines torture as:

> [A]ny act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, whether such pain or suffering is inflicting by or at the instigation of or within the consent or acquiescence of a public official or other person acting in an official capacity.

---

[1]See, e.g., U.N. Charter, chap. IX, art. 55, para. c (directing United Nations member countries to promote "universal respect for, and observance of, human rights and fundamental freedoms for all"); Universal Declaration of Human Rights, art. 5, G.A. Res. 217A (III), U.N. Doc. A/810 (1948) (stating that "[n]o one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment"); International Covenant on Civil and Political Rights, Dec. 16, 1966, art. 7, 999 U.N.T.S. 171, 6 I.L.M. 368 (stating that "[n]o one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment").  See generally J Herman Burgers & Hans Danelius, The United Nations Convention against Torture: A Handbook on the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment 5-30 (1988).

[2]See Status of the Ratification of the Convention against Torture ( v i s i t e d   N o v .   2 4 ,   2 0 0 4 ) (http://www.ohchr.org/english/law/cat-ratify.htm).

It does not include pain or suffering arising only from, inherent in or incident to lawful sanctions.

Art. 1(1), S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85. In turn, Article 3 of the CAT states: "No State Party shall expel, return ("*refouler*") or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." Art. 3(1), S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85.

President Reagan signed the Convention on April 18, 1988, with the following reservation: "The Government of the United States of America reserves the right to communicate, upon ratification, such reservations, interpretive understandings, or declarations as are deemed necessary." See Ogbudimpka v. Ashcroft, 342 F.3d 207, 211 (3d Cir. 2003); see also Declarations and Reservations (visited Nov. 24, 2004) (http://untreaty.un.org/ENGLISH/bible/englishinternetbible/partI /chapterIV/treaty14.asp). Approximately one month later, on May 20, 1988, the President transmitted the CAT to the Senate for its advice and consent with seventeen proposed conditions (four reservations, nine understandings, and four declarations). See Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, S. Exec. Rep. 101-30, at 2, 7 (1990).

In response to congressional and public concern regarding several of the proposed conditions, in January 1990 President George H. W. Bush submitted a revised and reduced list of proposed conditions. See id. at 2, 7-8; see also Ogbudimpka, 342 F.3d at 212 n.11. Of the proposed conditions, President Bush submitted several understandings, two of which are directly relevant to this case. First, with respect to Article 1 of the CAT, the President proposed the understanding that the "United States understands that, in order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or

suffering." <u>See</u> S. Exec. Rep. 101-30, at 9, 36.[3] This first understanding closely tracked a similar understanding initially submitted by President Reagan in 1988, which stated that the United States "understands that, in order to constitute torture, an act must be a deliberate and calculated act of an extremely cruel and inhuman nature, specifically intended to inflict excruciating and agonizing physical or mental pain or suffering." <u>See</u> S. Exec. Rep. 101-30, at 15.[4] Second, with respect to Article 3 of the CAT, President Bush submitted an understanding, previously submitted by President Reagan, that the United States "understands the phrase 'where there are substantial grounds for believing that he would be in danger of being subjected to torture,' as used in Article 3 of the Convention, to mean 'if it is more likely than not that he would be tortured.'" <u>See</u> S. Exec. Rep. 101-30, at 16, 36.[5]

---

[3]In a cover letter from Janet G. Mullins, Assistant Secretary, Legislative Affairs, Department of State, to Senator Claiborne Pell, Chairman of the Senate Committee on Foreign Relations, transmitting President Bush's revised reservations, understandings, and declarations to the CAT, it was stated that the revised understanding "maintains our position that specific intent is required for torture." <u>See</u> S. Exec. Rep. 101-30, at 35 (App. A).

[4]A summary and technical analysis of the Convention submitted by President Reagan to the Senate further stated: "[T]he requirement of intent to cause severe pain and suffering is of particular importance in the case of alleged mental pain and suffering, as well as in cases where unexpectedly severe physical suffering is caused. Because specific intent is required, an act that results in unanticipated and unintended severity of pain and suffering is not torture for purposes of this Convention." <u>See</u> S. Exec. Rep. 101-30, at 13-14.

[5]The Senate Report explains why this understanding was added:

> Article 3 forbids a State Party from forcibly returning a person to a country where there are "substantial grounds for believing that he would be in danger of being subjected to torture."

-8-

The Senate adopted a resolution of advice and consent to ratification of the CAT on October 27, 1990, subject to several reservations, understandings, and declarations. See 136 Cong. Rec. S17,486, S17491-92 (daily ed. 1990) ("Senate Resolution"). Importantly, the Senate adopted the two understandings proposed by President Bush with respect to Articles 1 and 3 of the Convention. Thus, the Senate explained that with reference to the definition of torture contained in Article 1 of the CAT, the "United States understands that, in order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering." See Senate Resolution, supra, II.1(a). Moreover, the Senate explained that with reference to the standard of proof required in Article 3 of the CAT, the "United States understands the phrase 'where there are substantial grounds for believing that he would be in danger of being subjected to torture,' as used in Article 3 of the Convention, to mean 'if it is more likely than not that he would be tortured.'" See Senate Resolution, supra, II.2.

Under U.S. immigration law, the United States can not deport an individual if "it is more likely than not that the alien would be subject to persecution." INS v. Stevic, 467 U.S. 407 (1984). U.S. immigration law also provides that asylum may be granted to an alien who is unwilling to return to his home country "because of persecution or a well-founded fear of persecution." INS v. Cardoza-Fonseca, 480 U.S. 421 (1987).

The administration's proposed understanding adopts the more stringent Stevic standard because the administration regards the *nonrefoulement* prohibition of article 3 as analogous to mandatory withholding of deportation. Therefore, article 3 would apply when it is "more likely than not" that the individual would be tortured upon return.

See S. Exec. Rep. 101-30, at 10.

Finally, pursuant to Article 26 of the Convention, President Clinton deposited the instrument of ratification with the United Nations on October 21, 1994.[6] See Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478, 8478 (Feb. 19, 1999); see also Status of the [Convention] (visited Nov. 24, 2004) (http://www.un.org/documents/ga/docs/53/plenary/a53-253.htm). Notably, the President included the Senate understandings in the instrument of ratification. See 1830 U.N.T.S. 320, 321, 322 (1994); Declarations and Reservations made upon Ratification, Accession, or Succession (visited Nov. 24, 2004) (http://untreaty.un.org/ENGLISH/bible/englishinternetbible/partI/chapterIV/treaty14.asp).

Because the resolution of advice and consent specified that the CAT was not self-executing, Congress proceeded to pass legislation in order to implement the United States' obligations under the Convention in 1998 with the Foreign Affairs Reform and Restructuring Act ("FARRA"). See Pub. L. No. 105-227, Div. G., Title XXII, § 2242, 112 Stat. 2681, 2681-822, codified as note to 8 U.S.C. § 1231.[7] The first section of FARRA, § 2242(a),

---

[6]Article 26 of the Convention states in pertinent part: "Accession shall be effected by the deposit of an instrument of accession with the Secretary-General of the United Nations." See art. 26, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85.

[7]Treaties that are not self-executing do not create judicially-enforceable rights unless they are first given effect by implementing legislation. See Ogbudimkpa, 342 F.3d at 218 (citing Mannington Mills, Inc. v. Congoleum Corp., 595 F.2d 1287, 1298 (3d Cir. 1979)). Several circuits have already determined that the CAT is not self-executing. See, e.g., Reyes-Sanchez v. United States Attorney Gen., 369 F.3d 1239, 1240 n.1 (11th Cir. 2004); Saint Fort v. Ashcroft, 329 F.3d 191, 202 (1st Cir. 2003); Wang v. Ashcroft, 320 F.3d 130, 140 (2d Cir. 2003); Castellano-Chacon v. INS, 341 F.3d 533, 551 (6th Cir. 2003). This Court, however, has not previously addressed whether the CAT is self-executing. See Ogbudimkpa, 342 F.3d at 218 n.22 (noting that because Congress passed FARRA to implement the United States' obligations under the CAT, "we need not consider whether CAT is self-executing").

-10-

contained a general statement of congressional policy, providing that: "It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture." In turn, § 2242(b), which substantively implements the CAT, directed "the heads of the appropriate agencies" to "prescribe regulations to implement the obligations of the United States under Article 3 of the [Convention], subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention." See 8 U.S.C. § 1231 note.

In accordance with § 2242(b) of FARRA, the Department of Justice, of which the Immigration and Naturalization Service ("INS") at that time was a division, promulgated regulations setting forth the procedures by which individuals could seek relief pursuant to the CAT. See 64 Fed. Reg. 8478 (Feb. 19, 1999), codified at 8 C.F.R. §§ 208.16(c), .17, & .18(a) (2004). Section 208.18(a) sets out the definitions to be used in applying the United States' obligations under the CAT and states: "The definitions in this subsection incorporate the definition of torture contained in Article 1 of the [Convention], subject to the

As noted later, we decide that the Convention is not self-executing.

On a side note, in Ogbudimpka, we briefly considered whether a claim seeking relief from removal on the grounds of alleged future torture should be called a "CAT claim" or a "FARRA claim." 342 F.3d at 221 n.24. We noted that, if it were true that the Convention was not self-executing, then strictly speaking an alien would seek relief under FARRA, and not the Convention. Id. Ultimately, however, given that the language of FARRA is virtually identical to the language of Article 3 of the Convention, we concluded that the difference between the terminology of a "CAT claim" versus a "FARRA claim" was inconsequential. Id. Accordingly, we used there, and we continue to use here, the colloquial reference to a "CAT claim" rather than a "FARRA claim" in discussing Auguste's requested relief. Id.

-11-

reservations, understandings, declarations, and provisos contained in the [Senate] resolution of ratification of the Convention." 8 C.F.R. § 208.18(a). Section 208.18(a)(1) proceeds then to adopt a basic definition of torture, mirroring the definition of torture in Article 1 of the CAT, which is then clarified by six additional provisions, several of which are relevant in this matter:

> (a)(1) Torture is defined as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

> (a)(2) Torture is an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or degrading treatment or punishment that do not amount to torture.

> (a)(3) Torture does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions . . . .

> (a)(5) In order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering. An act that results in unanticipated or unintended severity of pain and suffering is not torture.

In addition to clarifying the definition of torture that is to apply in the domestic context, the Department of Justice also promulgated regulations specifying the elements and burden of proof for a CAT claim. Section 208.16(c)(2), which tracks the

-12-

understanding proposed by the President and adopted by the Senate in its resolution of ratification, states that "[t]he burden of proof is on the applicant for withholding of removal to establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal."[8] If an applicant establishes that he "more likely than not would be tortured" upon return to his home country, withholding of removal or deferral of removal is mandatory. See 8 C.F.R. §§ 208.16(c)(3) and (4). The objective evidence to be considered in evaluating a CAT claim includes "[e]vidence of past torture inflicted upon the applicant;" "[e]vidence of gross, flagrant or mass violations of human rights within the country of removal;" and "[o]ther relevant information regarding conditions in the country of removal." See 8 C.F.R. § 208.16(c)(3); see also 8 C.F.R. § 208.17(a).[9]

---

[8]Auguste seeks deferral of removal, not withholding of removal. Regulations for withholding of removal are set out at 8 C.F.R. § 208.16, while regulations for deferral of removal are set out at 8 C.F.R. § 208.17. However, the general standards of eligibility for each are identical, i.e., a requirement that an alien establish that future "torture" is "more likely than not." See 8 C.F.R. § 208.16(c), .17(a); see also 64 Fed. Reg. 8478, 8481 (noting that "§ 208.17(a) is subject to the same standard of proof and definitional provisions as § 208.16(c)").

[9]Applications for relief under the CAT are not the only instance in which courts address torture-related claims. For instance, pursuant to Articles 4 and 5 of the Convention, the United States enacted §§ 2340-2340A of the U.S. Criminal Code, which criminalize torture in the United States and defines torture as any "act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control." 18 U.S.C. §§ 2340-2340A.

In addition, the Torture Victims Protection Act ("TVPA"), 28 U.S.C. § 1350 note (2000), provides a civil tort remedy for victims of torture. Torture is defined under the TVPA as:

## C.    The Immigration Judge's Decision

On November 12, 2003, an immigration judge ("IJ") issued an oral decision finding Auguste ineligible for deferral of removal under the CAT. The IJ began by noting that Auguste had conceded that he had never been tortured in the past in Haiti, and that his application was based on the likelihood that he would be detained upon arrival and subject to harsh prison conditions. (J.A. 43.) In denying Auguste's claim for CAT relief, the IJ found that the matter was governed by the Board of Immigration Appeals' ("BIA") decision in Matter of J-E-, 23 I. & N. Dec. 291 (BIA 2002), a 13-5 decision interpreting the elements of a claim for relief under the CAT.

In Matter of J-E-, the BIA considered the same issue raised by Auguste: whether Haiti's indefinite detention of criminal deportees, the deplorable prison conditions in Haiti, and the physical abuse of prisoners constitute "torture" as that term is defined under the Convention and the implementing regulations. Id. at 292. The BIA emphasized that the Convention itself expressly differentiates between "torture" and "other acts of cruel, inhuman or degrading treatment or punishment." Id. at 295.[10]

> any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind.

[10]"Torture" is prohibited by Article 1 of the CAT, while "other acts of cruel, inhuman or degrading treatment or punishment" are

-14-

Only those acts that constitute torture under Article 1 trigger the requirement that an individual's return to the removal country be suspended. Id. In exploring the difference between "torture" and "other acts of cruel, inhuman or degrading treatment or punishment," the BIA noted that "the act [of torture] must cause severe pain or suffering, physical or mental. It must be an extreme form of cruel and inhuman treatment, not lesser forms of cruel, inhuman, or degrading treatment or punishment that do not amount to torture." Id. at 297 (citing 8 C.F.R. §§ 208.18(a)(1),(2)).

With reference to the regulations implementing the CAT, the BIA summarized a five-part test for determining whether an act rises to the level of torture:

> For an act to constitute torture it must be: (1) an act causing severe physical or mental pain or suffering; (2) intentionally inflicted; (3) for a proscribed purpose; (4) by or at the instigation of or with the consent or acquiescence of a public official who has custody or physical control of the victim; and (5) not arising from lawful sanctions.

Matter of J-E-, 23 I. & N. Dec. at 297. As to the second element, that of intent, the BIA explained that the "act must be specifically intended to inflict severe physical or mental pain or suffering. This specific intent requirement is taken directly from the understanding contained in the Senate ratification resolution . . . . Thus, an act that results in unanticipated or unintended severity of pain or suffering does not constitute torture." Id. at 298 (citation omitted). The BIA went on to define "specific intent" with reference to its common legal definition: "specific intent is defined as the intent to accomplish the precise criminal act that one is later charged with while general intent commonly takes the form of recklessness." Id. at 301 (quoting Black's Law Dictionary 813-14 (7th ed. 1999)).

In light of the requirements of 8 C.F.R. § 208.18(a), the BIA in Matter of J-E- considered whether any of the alleged state

---

prohibited by Article 16 of the CAT. Id. at 295-96.

actions by Haiti – indefinite detention, inhuman prison conditions, and police mistreatment – constituted torture. First, with regards to the policy of indefinite detention, the BIA concluded that it appeared to be a "lawful enforcement sanction designed by the Haitian Ministry of Justice to protect the populace from criminal acts committed by Haitians who are forced to return to the country after having been convicted of crimes abroad." Id. at 300. Accordingly, the BIA concluded that the detention policy was a lawful sanction and, standing alone, did not constitute torture by virtue of 8 C.F.R. § 208.18(a)(3). See id. In addition, the BIA noted that "there is no evidence that Haitian authorities are detaining criminal deportees with the specific intent to inflict severe physical or mental pain or suffering" within the meaning of 8 C.F.R. § 208.18(a)(1). See id.

Second, with regards to the inhuman prison conditions in Haiti, even when coupled with the possibility of indefinite detention, the BIA again concluded that this did not constitute torture. In particular, the BIA noted that there was "no evidence that they are intentionally and deliberately creating and maintaining such prison conditions in order to inflict torture." Id. at 301 (citing 8 C.F.R. §§208.18(a)(1), (5)). The BIA noted that this specific intent requirement was drawn from the Senate's understanding, which accompanied the resolution of advice and consent, and was distinct from a general intent requirement. See id. To the contrary, the BIA concluded that the prison conditions were not the result of any specific intent to inflict severe physical or mental pain or suffering, but rather were the "result of budgetary and management problems as well as the country's severe economic difficulties." Id.

Finally, the BIA considered whether police mistreatment of prisoners constituted torture. The BIA noted that there had been reports of isolated instances of police mistreatment, some of which could rise to the level of torture. See id. at 302. In particular, the BIA noted that while certain "[i]nstances of police brutality do not necessarily rise to the level of torture . . . deliberate vicious acts such as burning with cigarettes, choking, hooding, kalot marassa [severe boxing of the ears, which can result in eardrum damage], and electric shock may constitute acts of torture." Id. Although

-16-

the alien in <u>Matter of J-E-</u> had shown that acts of torture have occurred in Haitian prisons, the BIA concluded that he had failed to satisfy the requisite burden of proof, <u>i.e.</u>, that it was more likely than not that he would be tortured if returned to Haiti. <u>See</u> <u>id.</u> at 304.[11] The alien had made no claim of past torture, and the basis of his CAT claim was premised on the possibility that he would be subject to police mistreatment when detained in a Haitian prison. Accordingly, the BIA concluded that the alien had failed to establish that the severe yet isolated instances of mistreatment were "so pervasive as to establish a probability that a person detained in a Haitian prison will be subject to torture, as opposed to other acts of cruel, inhuman, or degrading punishment or treatment." <u>Id.</u> at 304. In other words, the alien's evidence had failed to show that he as an individual in a Haitian prison was more likely than not to suffer "torture," as defined by the CAT, as opposed to "other acts of cruel, inhuman or degrading punishment or treatment." <u>Id.</u>[12]

Returning to the present matter, the IJ found Auguste's CAT claim to be virtually indistinguishable from the matter presented in

---

[11]In considering whether an alien has satisfied his burden of proof, the BIA stated that:

> all evidence relevant to the possibility of future torture shall be considered, including, but not limited to: (1) evidence of past torture inflicted upon the applicant; (2) evidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured; (3) evidence of gross, flagrant, or mass violations of human rights within the country of removal, where applicable; and (4) other relevant information regarding conditions in the country of removal.

<u>Matter of J-E-</u>, 23 I. & N. Dec. at 303 (citing 8 C.F.R. § 208.16(c)(3)).

[12]It does not appear that the aggrieved alien in <u>Matter of J-E-</u> appealed the adverse decision of the BIA or otherwise filed a habeas petition.

-17-

Matter of J-E-, noting that counsel "for [Auguste] is not claiming here today that the situation in Haiti is somehow different from the situation that confronted the [alien] in [Matter of J-E-]." (J.A. 46.) Accordingly, the IJ denied Auguste's request for deferral of removal. Auguste appealed the IJ's decision to the BIA, which, on February 27, 2004, affirmed the IJ's decision without an opinion. Accordingly, the IJ's decision is the final agency determination for purposes of our review. See Dia v. Ashcroft, 353 F.3d 228 (3d Cir. 2003) (en banc).

### D. Auguste's Habeas Petition

On March 9, 2004, in the District of New Jersey, Auguste filed a Verified Petition for a Writ of Habeas Corpus and Complaint for Declaratory and Injunctive Relief, as well as a request for a stay of removal, on the grounds that the decision of the IJ, as affirmed by the BIA, erroneously denied him relief under the Convention for deferral of removal to Haiti. Count One of Auguste's petition alleged that his CAT claim was denied improperly based on Matter of J-E-'s interpretation of the phrase "specifically intended" in 8 C.F.R. § 208.18(a)(5) to require a showing of "specific intent" as that term is used in U.S. criminal law. In addition, Auguste contended that the BIA in Matter of J-E- erroneously concluded that the detention of criminal deportees in harsh and deplorable prison conditions did not constitute torture. Count Two of Auguste's petition alleged that his CAT claim was improperly denied because the Department of Justice had adopted regulations at 8 C.F.R. § 208.16(c)(2) that set the burden of proof for CAT relief higher than what was required by Article 3 of the Convention and FARRA.

The District Court began by noting that the conditions which Auguste would be subjected to in Haiti "can objectively be described as horrifying prison conditions which are inflicted upon anyone unfortunate enough to find themselves in custody in Haiti." (J.A. 14.) Nonetheless, the District Court denied Auguste's habeas petition on the merits, finding that the BIA in Matter of J-E- properly interpreted the intent requirement of 8 C.F.R. § 208.18(a)(5). The District Court noted that "we have circumstances here where we have simply the allegation of general

prison conditions in Haiti. So it does not appear to me that [Auguste] has made any showing that his pain and suffering or physical or mental injury would be intentionally inflicted." (J.A. 15.) The District Court concluded that "there must be some sort of underlying intentional direction of pain and suffering against a particular petitioner, more so than simply complaining of the general state of affairs that constitute conditions of confinement in a place, even as unpleasant as Haiti." (J.A. 18.) The District Court, however, did not appear to reach the issue of whether the BIA's application of the burden of proof in 8 C.F.R. § 208.16(c)(2) was inconsistent with Article 3 of the CAT or FARRA.

This timely appeal followed.

## II. JURISDICTION AND SCOPE OF REVIEW

As an alien convicted of an aggravated felony/drug trafficking crime and removable on such grounds, Auguste is statutorily barred from filing a petition for direct review from the BIA's decision to a court of appeals challenging his ineligibility for relief under the CAT. See 8 U.S.C. § 1252; see also Bakhtriger v. Elwood, 360 F.3d 414, 420 (3d Cir. 2004). Several of the circuits, including this one, however, have concluded that aliens convicted of crimes retain the right to seek relief under the traditional habeas statute for alleged violations of the Convention. See Ogbudimpka, 342 F.3d at 215-22; see also Cadet v. Bulger, 377 F.3d 1173, 1182 (11th Cir. 2004); Saint Fort v. Ashcroft, 329 F.3d 191, 200-02 (1st Cir. 2003); Wang v. Ashcroft, 320 F.3d 130, 140-43 (2d Cir. 2003); Singh v. Ashcroft, 351 F.3d 435, 441-42 (9th Cir. 2003). We have jurisdiction over appeals involving habeas petitions filed in the District Court pursuant to 28 U.S.C. §§ 1291, 2241, and 2253.

The scope of review of an alien's habeas petition is far narrower than that typically available to an alien who has filed a direct petition for review to a court of appeals. On direct petitions for review, we review factual findings made by an immigration judge or the BIA under the familiar substantial evidence standard. See Mulanga v. Ashcroft, 349 F.3d 123, 131 (3d Cir. 2003); see also Dia, 353 F.3d at 247-48. However, on a habeas petition, our

review does not extend so far. It is limited to constitutional issues and errors of law, including both statutory interpretations and application of law to undisputed facts or adjudicated facts, but does not include review of administrative fact findings or the exercise of discretion. See Bakhtriger, 360 F.3d at 425 ("In the wake of [INS v. St. Cyr, 533 U.S. 289 (2001)] we are not aware of any cases that have upheld habeas review of factual findings or discretionary determinations in criminal alien removal cases."); Ogbudimpka, 342 F.3d at 222; see also Cadet, 377 F.3d at 1184; Bravo v. Ashcroft, 341 F.3d 590, 592 (5th Cir. 2003); Gutierrez-Chavez v. INS, 298 F.3d 824, 829-30 (9th Cir. 2002), amended by 337 F.3d 1023; Carranza v. INS, 277 F.3d 65, 71-73 (1st Cir. 2002); Sol v. INS, 274 F.3d 648, 651 (2d Cir. 2001); Bowrin v. INS,194 F.3d 483, 489-90 (4th Cir. 1999).[13]

---

[13]We note that neither party has addressed whether the regulation-specific jurisdiction-stripping provision of § 2242(d) of FARRA affects our jurisdiction in this matter. See § 2242(d) ("[N]o court shall have jurisdiction to review the regulations adopted to implement this section."). In Ogbudimpka, we held that a different aspect of § 2242(d), stating that "nothing in this section shall be construed as providing any court jurisdiction to consider or review claims raised under the Convention . . . except as part of a review of a final order of removal," does not affect habeas review. See Ogbudimkpa, 342 F.3d at 215-16 (noting that "Ogbudimkpa does not challenge the regulations themselves, but the IJ's application of the regulations to his case, and thus [the regulation-specific jurisdiction-stripping] provision is not implicated"). The regulation-specific jurisdiction-stripping provision may be relevant insofar as any of Auguste's arguments may be construed as challenging the regulations themselves, instead of their application to his case.

We believe the rationale behind Ogbudimpka applies here with the same force. In St. Cyr, the Supreme Court held that "at the absolute minimum, the Suspension Clause protects the writ [of habeas corpus] as it existed in 1789." 533 U.S. at 301 (internal quotation omitted). The Court found that, at that time, "the issuance of the writ was not limited to challenges to the jurisdiction

-20-

Keeping in mind the narrow scope of our habeas review, we now turn to consider Auguste's appeal.

## III. ANALYSIS

In his appeal from the denial of his habeas petition, Auguste raises three arguments. First, Auguste contends that the BIA erred as a matter of law in Matter of J-E-, upon which the IJ relied in denying Auguste's application, in construing the definition of torture in 8 C.F.R. § 208.18(a)(1) and (a)(5) to require a showing of "specific intent" to inflict severe pain and suffering. Auguste contends that such a specific intent requirement is inconsistent with the Convention's commonly understood international interpretation as well as the Third Circuit's prior decision in Zubeda v. Ashcroft, 333 F.3d 463 (3d Cir. 2003). Second, Auguste contends that the Department of Justice promulgated regulations at 8 C.F.R. § 208.16(c)(2), which require that an alien show "more likely than not that he or she would be tortured," that are inconsistent with Article 3 of the Convention, which only requires that an alien show that there are "substantial grounds for believing the person would be in danger of being subjected to torture." Finally, Auguste contends that even if the specific intent standard is the correct standard in defining torture, and even if the correct burden of proof is the "more likely than not" standard, he is nonetheless entitled to relief under the Convention because Haitian authorities knowingly and purposefully detain criminal deportees, such as him, in prison conditions that he contends are tortuous.

---

of the custodian, but encompassed detentions based on errors of law, including the erroneous application or interpretation of statutes." Id. at 302. Thus, just as the wholesale jurisdiction-stripping provision of FARRA cannot eliminate habeas jurisdiction without what has been termed a "superclear statement" or "magic words," id. at 327 (Scalia, J., dissenting) (characterizing the requirement set forth by the majority), the regulation-specific jurisdiction-stripping provision may not restrict that jurisdiction beyond its 1789 form without such an unmistakably clear statement, which is lacking in either provision of § 2242(d).

We address each argument in turn.

## A.     The Standard of Intent Required for CAT Relief

### 1.

8 C.F.R. § 208.18(a)(5) states that in order for an act to constitute torture, "[it] must be specifically intended to inflict severe physical or mental pain or suffering. An act that results in unanticipated or unintended severity of pain and suffering is not torture." In Matter of J-E-, the BIA stated that the "ratification [history of the CAT] make it clear that this is a 'specific intent' requirement not a 'general intent' requirement." 23 I. & N. Dec. at 300-01. Thereafter, the BIA defined the term "specific intent" by its ordinary usage in American law as the "intent to accomplish the precise criminal act that one is later charged with." Id. at 301 (internal quotations omitted). Auguste, however, contends that the specific intent standard is at odds with the prevailing and commonly understood meaning of Article 1 of the Convention. Auguste argues that the infliction of severe pain and suffering, so long as the pain and suffering is not unanticipated or unintended, would satisfy the definition of torture under Article 1 of the Convention, and that the BIA's specific intent standard is in conflict with the more liberal standard he proposes. Auguste in effect suggests that a general intent standard would satisfy the requirements of Article 1 of the Convention, arguing that torture exists where the "actor had knowledge that the action (or inaction) might cause severe pain and suffering." Appellant's Br. at 25. Because this involves a pure question of law, we have habeas jurisdiction over the issue. See Bakhtriger, 360 F.3d at 425.[14]

---

[14]This, of course, is not the first instance in which this Court has applied the standards for relief under the CAT and its regulations. See, e.g., Sevoian v. Ashcroft, 290 F.3d 166, 174-78 (3d Cir. 2002) (denying alien facing deportation to Republic of Georgia relief under the CAT). However, we are not aware of a prior decision by this Court, or any other court, that has analyzed whether the Department of Justice or the BIA thereunder have faithfully implemented the United States' obligations under the Convention.

The issue that we must resolve then is what the controlling standard for relief under the Convention is in the domestic context. Is it, as Auguste contends, the standard of intent that he believes is the prevailing requirement under international legal interpretations of the Convention?  Or is it, as the Government contends, the specific intent standard which the Department of Justice adopted in the Convention's implementing regulations issued pursuant to FARRA, and interpreted by the BIA in Matter of J-E-?  We approach this matter mindful of the sensitive considerations that are raised in Auguste's habeas petition.  Auguste is asking this Court in effect to declare the administrative regulations implementing the United States' obligations under the Convention, and implicitly the understandings which accompanied the United States' ratification, to be inconsistent with the Convention.

In so doing, Auguste invites this Court to inquire into the meaning of Article 1 of the Convention, its drafting history, and the interpretation of Article 1 by various international tribunals. Should we do so, we would of course not be interpreting the treaty from scratch, and the Government's interpretation would be accorded some deference.  "[A]lthough not conclusive," the interpretive views of the government agencies that have been charged with the negotiation and enforcement of a treaty are "entitled to great weight."  See United States v. Stuart, 489 U.S. 353, 369 (1989) (internal citations omitted); see also El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng, 525 U.S. 155, 168 (1999) ("Respect is ordinarily due to reasonable views of the Executive Branch concerning the meaning of an international treaty.") (internal citations omitted); Kolovrat v. Oregon, 366 U.S. 187, 194 (1961).  We, however, see no reason to be drawn into a debate about the appropriate interpretation of Article 1 of the Convention, or what the prevailing international understanding of the intent standard required under Article 1 of the Convention is.  As will be discussed below, we believe that we must apply the standard clearly stated in the ratification record of the United States.

**2.**

In FARRA, Congress directed the appropriate agencies to implement the United States' obligations under the CAT "subject

-23-

to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the [CAT]." § 2242(b), codified at 8 U.S.C. § 1231 note. Congress passed FARRA because the Senate had explicitly included a declaration in its resolution of ratification that the Convention was not self-executing. See Ogbudimpka, 342 F.3d at 212 (citing 136 Cong. Rec. 36,198 (1990)). Because the CAT was not self-executing, FARRA, at least in the domestic context, represented a clear statement on the part of Congress to incorporate into domestic law the understandings submitted by the President and adopted by the Senate in its resolution of ratification, including the understanding that "in order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering." The Department of Justice, in promulgating the relevant regulations, adopted verbatim the understanding in defining the intent standard at 8 C.F.R. § 208.18(a)(5). Thus, in our opinion, FARRA codified the Senate's understandings into domestic law.

Auguste, however, contends that the United States' understanding regarding specific intent was without effect and could not be enacted into domestic law as part of FARRA. In particular, Auguste argues that because the understanding regarding specific intent was in conflict with the accepted international interpretation of the Convention as he believes it to be, it could not modify the United States' obligations under the Convention. Auguste appears to rely in part on Article 19 of the Vienna Convention on the Law of the Treaties, which states that reservations to a treaty ratification are prohibited where they are "incompatible with the object and purpose of the treaty." See Vienna Convention on the Law of Treaties, May 23, 1969, art. 19, 1155 U.N.T.S. 331.[15] Auguste also contends more generally that an understanding "that conflicts with those of other signatory states

---

[15]The United States has not ratified the Vienna Convention on the Law of Treaties. Nonetheless, several courts have stated that they look to it "as an authoritative guide to the customary international law of treaties." See, e.g., Ehrlich v. Am. Airlines, Inc., 360 F.3d 366, 373 n.5 (2d Cir. 2004).

[is] of little weight," suggesting at one point that the fact that the Netherlands objected to the United States' understanding as overly restrictive should weigh in this Court's analysis. Appellant's Reply Br. at 11, 14. Thus, according to Auguste, FARRA could not modify or abrogate the United States' obligations under the Convention merely by incorporating the understanding accompanying the United States' ratification of the Convention because that understanding was void under international norms governing treaty interpretation.[16]

The issue of whether and in what circumstances courts should give effect to reservations, declarations and understandings to treaties is a hotly contested area of academic debate. See Curtis A. Bradley & Jack L. Goldsmith, *Treaties, Human Rights, and Conditional Consent*, 149 U. Pa. L. Rev. 399, 401-02 (2000). To date, several courts have enforced reservations, understandings, or declarations, but we are not aware of any court that has considered

---

[16]Auguste makes a related argument: because the understandings were without effect, and thus the interpretation of the Convention he advocates was in effect upon ratification in the United States, a clear statement was required by Congress to modify or abrogate the treaty in FARRA to enact the specific intent standard. Auguste relies on the well-known rule that a "treaty will not be deemed to be abrogated or modified by a later statute unless such purpose on the part of Congress has been clearly expressed." See Trans World Airlines v. Franklin Mint Corp., 466 U.S. 243, 252 (1984) (quotations omitted). In Auguste's view, Congress' statement in § 2242(b) of FARRA directing the appropriate agencies to implement the United States' obligations under the CAT "subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the [CAT]," 8 U.S.C. § 1231 note, was not a clear enough statement to modify or abrogate the Convention as it was ratified by the United States. Because we ultimately conclude that the understandings must be given domestic legal effect, we need not address this argument.

their validity in any detail.[17]  However, we believe that resolution of this issue in this case is fairly straightforward.

We begin by noting that the Constitution vests the President and the U.S. Senate with the responsibility of making treaties, stating that the President "shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur."  <u>See</u> U.S. Const. art. II, sec. 2, cl. 2.[18]  As part of its role in the advice and consent process, the U.S. Senate has routinely attached conditions to ratification known as reservations, understandings, and declarations.[19]

---

[17]<u>See, e.g.</u>, <u>Igartua de la Rosa v. United States</u>, 32 F.3d 8, 10 n.1 (1st Cir. 1994) (enforcing declaration that the International Covenant on Civil and Political Rights was not self-executing); <u>Ralk v. Lincoln County</u>, 81 F. Supp. 2d 1372, 1380 (S.D. Ga. 2000) (same); <u>Sandhu v. Burke</u>, No. 97 Civ. 4608 (JGK), 2000 WL 191707 (S.D.N.Y. Feb. 10, 2000) (enforcing declaration that the CAT was not self-executing); <u>Calderon v. Reno</u>, 39 F. Supp. 2d 943, 956 (N.D. Ill. 1998) (same); <u>White v. Paulsen</u>, 997 F. Supp. 1380, 1387 (E.D. Wash. 1998) (same).

[18]In practice, the treaty-making process operates as follows. After the executive branch negotiates the terms of a treaty with foreign nations, and a completed draft is signed, the President thereafter transmits the treaty to the Senate for its advice and consent.  If the treaty receives the required two-thirds vote, the Senate sends a resolution to the President approving the treaty. The President has the discretion at this point to ratify or not ratify the treaty.  Should the President decide to ratify the treaty, he will sign the instrument of ratification and deposit it in a place typically specified by the treaty.  <u>See</u> Bradley & Goldsmith, <u>supra</u>, (citing Congressional Research Service, Treaties and Other International Agreements: The Role of the United States Senate, 103rd Congress, 1st Sess., at 75-120 (1993)).

[19]Although we are aware of no cases construing the limits of the Senate's prerogative to attach reservations, understandings, and declarations as part of its advice and consent function to ratification, we note in passing that the Supreme Court has

As we recounted at some length above in Part I.B, the specific intent standard was the standard accepted by both the President and the Senate during the ratification process. Both Presidents Reagan and Bush submitted nearly identical understandings containing the language stating that for an act to constitute torture, it must be specifically intended to inflict severe pain and suffering. See S. Exec. Rep. 101-30, at 9, 15. The Senate adopted the language of President Bush's understanding in its resolution of ratification. See Senate Resolution, supra, II.1(a). Moreover, when the President deposited the instrument of ratification with the United Nations, he did so with the relevant understanding relating to the specific intent requirement. See 1830 U.N.T.S. 320, 321; Declarations and Reservations made upon Ratification, Accession, or Succession (visited Nov. 24, 2004) (http://untreaty.un.org/ENGLISH/bible/englishinternetbible/partI /chapterIV/treaty14.asp).

Thus, we are presented with a situation where both the President and the Senate, the two institutions of the federal government with constitutional roles in the treaty-making process, agreed during the ratification stage that their understanding of the definition of torture contained in Article 1 of the Convention included a specific intent requirement. In our view, this is enough to require that the understanding accompanying the United States' ratification of the Convention be given domestic legal effect, regardless of any contention that the understanding may be invalid under international norms governing the formation of treaties or the terms of the Convention itself. We think it so plain a proposition that the United States may attach an understanding interpreting the meaning of a treaty provision as part of the ratification process that, where as here there is clear consensus among the President and Senate on that meaning, a court is obliged to give that

_____

previously held that the Senate's ability to put forward its understanding of a treaty does not extend beyond the ratification process. See Fourteen Diamond Rings v. United States, 183 U.S. 176, 180 (1901) ("The meaning of the treaty cannot be controlled by subsequent explanations of some of those who may have voted to ratify it.").

understanding effect.

We find support for this position in the Restatement (Third) of the Foreign Relations Law of the United States, a persuasive authority. Section 314(2) of the Restatement states: "When the Senate gives its advice and consent to a treaty on the basis of a particular understanding of its meaning, the President, if he makes the treaty, must do so on the basis of the Senate's understanding." See Restatement (Third) of the Foreign Relations Law of the United States § 314 (2004). Comment d to § 314 further states: "A treaty that is ratified or acceded to by the United States with a statement of understanding becomes effective in domestic law subject to that understanding." See § 314 cmt. d. Thus, we hold that, for purposes of domestic law, the understanding proposed by the President and adopted by the Senate in its resolution of ratification are the binding standard to be applied in domestic law.

In so holding, we should be clear what this case is not about. We are not presented with a situation where the President and the Senate took contradictory positions on the meaning of a treaty provision during the ratification process. Nor are we required to resolve the situation where the President is contending that a Senate conditionality of ratification is improper, infringes on executive authority, or is without domestic or international legal effect. Undoubtedly, these situations, and others like them, would present more difficult constitutional issues. Instead, we are presented with a situation where both the President and Senate shared an understanding as to the meaning of a treaty provision during the ratification process.

Thus, because we find that the governing standards to be applied in the domestic context are those in the understanding that accompanied the United States' ratification of the treaty, and which were later incorporated in FARRA's implementing legislation, we believe that Auguste's claim that a specific intent standard is in conflict with what he perceives to be the prevailing international consensus misses the point. Generally, it is true that courts should interpret treaties so as to give a "meaning consistent with the shared expectations of the contracting parties." See Air France v. Saks, 470 U.S. 392, 399 (1985); see also MacNamara v. Korean

-28-

Air Lines, 863 F.2d 1135, 1143 (3d Cir. 1988) (noting that "our role in treaty interpretation is limited to ascertaining and enforcing the intent of the treaty parties"). Moreover, it is well-established that when construing international agreements, courts will often look to the drafting history of the agreement, as well as the intent of the other signatory parties, as Auguste now proposes. See Stuart, 489 U.S. at 366-69; see also El Al Israel Airlines, Ltd., 525 U.S. at 167 ("Because a treaty ratified by the United States is not only the law of this land . . . but also an agreement among sovereign powers, we have traditionally considered as aids to its interpretation the negotiating and drafting history (*travaux preparatoires*) and the postratification understanding of the contracting parties.") (citations omitted). However, we believe that where the President and the Senate express a shared consensus on the meaning of a treaty as part of the ratification process, that meaning is to govern in the domestic context.[20]

---

[20]In passing, we express some skepticism as to whether it is so obvious, as Auguste contends, that the United States' understanding of Article 1 of the Convention as requiring "specific intent" is inconsistent with the Convention, as he contends it is generally understood internationally.

Auguste relies on several sources in support of his contention that a specific intent standard would be inconsistent with the common understanding of Article 1 of the Convention. For instance, he notes that during the negotiations of the treaty, a U.S. proposal for Article 1 that read "the offence of torture includes any act by which extremely severe pain and suffering, whether physical or mental, is deliberately and maliciously inflicted" was rejected. See Burgers and Danelius, supra, at 41-42. However, in our view, it does not follow necessarily that the final language of Article 1 was a repudiation of a specific intent standard.

We also believe it to be telling that both Presidents Reagan and Bush submitted the condition interpreting Article 1 with the "specifically intended" language as an understanding, and not as a reservation or declaration. This suggests to us that the commonly

**3.**

Based on the ratification record, there is no doubt that the applicable standard to be applied for CAT claims in the domestic context is the specific intent standard, which was adopted verbatim by the Department of Justice in 8 C.F.R. § 208.18(a)(5) from the understanding accompanying ratification. We now consider whether the BIA's interpretation of the specific intent standard in <u>Matter of J-E-</u>, which defined the term by reference to its ordinary meaning in American law, was appropriate.[21]

understood meaning at the time of ratification was that, at least to the United States, the specific intent standard was consistent with a reasonable interpretation of the language in Article 1.

In any event, we need not resolve this issue. Whether specific intent is or is not commonly understood to be part of Article 1's definition of torture is not relevant to our holding. But, as the CAT gains increased attention in light of recent events abroad, we are confident that the debate on this question will continue.

[21]We note that this issue was itself a source of division within the BIA. In <u>Matter of J-E-</u>, one Board member, in dissent, wrote:

> Contrary to what the majority suggests, the regulatory requirement that the torture be "specifically intended" does not mean that proof of specific intent, as that term is used in American criminal prosecutions, is required . . . . The majority's reading of the regulations functionally converts the Senate understanding that torture must be "specifically intended" into a "specific intent" requirement. I disagree. I can find no basis to conclude that the Senate understanding was intended to require proof of an intent to accomplish a precise criminal act, as the majority contends is required. Rather, the plain language of the text of 8 C.F.R. § 208.18(a)(5) reflects only that something more than an accidental consequence is necessary to

Our resolution of whether the BIA's interpretation of the specific intent standard in 8 C.F.R. § 208.18(a)(5) was appropriate implicates two well-known principles of deference. First, the BIA's interpretation and application of immigration law are subject to Chevron deference. See Tineo v. Ashcroft, 350 F.3d 382, 396 (3d Cir. 2003) ("There is no longer any question that the BIA should be accorded Chevron deference for its interpretations of the immigration laws.") (citing INS v. Aguirre-Aguirre, 526 U.S. 415, 424 (1999)).[22]  Second, this Court owes deference to the agency's

> establish the probability of torture.
>
> Nowhere does the regulation state that the respondent must prove that the prospective torture he may face will result from the torturer's specific intent to torture him. Indeed, it would be difficult, if not impossible, to prove specific intent in a prospective context.

23 I. & N. Dec. at 315-16 (Rosenberg, Comm'r, dissenting).

Another Board member in dissent wrote: "We are in the early stages of the very difficult and thankless task of construing the Convention. Only time will tell whether the majority's narrow reading of the torture definition and its highly technical approach to the standard of proof will be the long-term benchmark for our country's implementation of this international treaty . . . . I do not believe the majority adequately carries out the language or the purposes of the Convention and the implementing regulations." Id. at 309 (Schmidt, Comm'r, dissenting).

[22]Under the Chevron analysis, in determining whether an agency's interpretation of the statute which it administers is reasonable, the initial question is whether the statute is silent or ambiguous with respect to the specific issue. If the statutory language is clear, the court need not look any further, and the agency's interpretation fails if it is inconsistent with the plain language. If, however, the statute is silent or ambiguous, the question for the court is whether the agency's interpretation is

interpretation to the extent that the CAT involves issues of immigration law which may implicate questions of foreign relations. See INS v. Aguirre-Aguirre, 526 U.S. 415, 424 (1999) (noting that "judicial deference to the Executive Branch is especially appropriate in the immigration context where officials exercise especially sensitive political functions that implicate questions of foreign relations") (citations omitted).

In light of these principles, we cannot say that the BIA erred in its interpretation of the "specific intent" requirement in Matter of J-E- by defining that term as it is ordinarily used in American

---

based on a permissible construction of the statute. See Chevron U.S.A. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984).

Auguste contends that Chevron deference to the BIA's interpretation of the Convention is not appropriate because the BIA does not have any particular expertise in interpreting treaties. Whether agencies are to be given Chevron deference when interpreting and implementing treaties is an unsettled topic. See generally Curtis A. Bradley, *Chevron Deference and Foreign Affairs*, 86 Va. L. Rev. 649 (2000). We note that some courts have applied or suggested applying Chevron deference to agency interpretation and implementation of United States' treaty obligations. See, e.g., Hill v. Norton, 275 F.3d 98, 104 (D.C. Cir. 2001) (applying Chevron framework to agency's interpretation of a treaty and an implementing statute); see also Collins v. Nat'l Transp. Safety Bd., 351 F.3d 1246, 1251 (D.C. Cir. 2003) (applying some standard of deference to an agency construction of a treaty). However, in this matter, because we view the issue as one of the BIA interpreting and applying FARRA and its implementing regulations, and not the Convention per se, we do not believe that resolution of the issue is necessary. This is particularly so because we believe there is no ambiguity in the Convention for which we would need to afford the BIA any deference in the first place. Accordingly, unless there be any misunderstanding, we afford Chevron deference to the BIA's interpretation of FARRA and the implementing regulations in Matter of J-E- and no more.

criminal law. In other contexts, we have noted that "congressional intent is presumed to be expressed through the ordinary meaning of the statute's plain language." United States v. Whited, 311 F.3d 259, 263 (3d Cir. 2002). We think that the same principle applies when interpreting an understanding proposed by the President and adopted by the Senate in its resolution of ratification. Thus, in light of the use of the phrase "specifically intended" in the understanding to ratification, the BIA acted reasonably in interpreting that language as mandating the use of a specific intent requirement and defining that term in accord with its ordinary meaning in American law. Matter of J-E-, 23 I. & N. Dec. at 301 ("specific intent is defined as the intent to accomplish the precise criminal act that one is later charged with while general intent commonly takes the form of recklessness") (internal quotations omitted).

Auguste's contention that the introduction of criminal law concepts into the standard for relief under the Convention was in error because the Convention is not about criminal prosecution, but rather about protecting the victims of torture, is besides the point. The specific intent standard is a term of art that is well-known in American jurisprudence. The Supreme Court has explained that in order for an individual to have acted with specific intent, he must expressly intend to achieve the forbidden act. See Carter v. United States, 530 U.S. 255, 269 (2000). In contrast, the more relaxed general intent standard typically only requires that a defendant "possessed knowledge with respect to the *actus reus* of the crime." Carter, 530 U.S at 268.[23]

_____

[23]In explaining the difference between specific and general intent, the Supreme Court used the following example to distinguish the two mental states:

> [A] person entered a bank and took money from a teller at gunpoint, but deliberately failed to make a quick getaway from the bank in the hope of being arrested so that he would be returned to prison and treated for alcoholism. Though this defendant

Thus, in the context of the Convention, for an act to constitute torture, there must be a showing that the actor had the intent to commit the act as well as the intent to achieve the consequences of the act, namely the infliction of the severe pain and suffering. In contrast, if the actor intended the act but did not intend the consequences of the act, i.e., the infliction of the severe pain and suffering, although such pain and suffering may have been a foreseeable consequence, the specific intent standard would not be satisfied. Auguste's suggestion that torture exists where the "actor had knowledge that the action (or inaction) might cause severe pain and suffering," Appellant's Br. at 25, is inconsistent with the meaning of specific intent.

Nonetheless, despite what we think is the clear import of the use of the phrase "specifically intended" in 8 C.F.R. § 208.18(a)(5) and the understanding attached to ratification, the Government inserted a curious footnote in its Brief to this Court, stating that:

> There has been some confusion about the [BIA's] reading of the specific-intent requirement. At one point in [Matter of J-E-] the majority stated that, "[a]lthough Haitian authorities are intentionally detaining criminal deportees knowing that the detention facilities are substandard, there is no evidence that they are intentionally and deliberately creating and maintaining such prison conditions in order to inflict torture." 23 I. & N. Dec. at 301. However, when read in light of the majority's other statements describing the intent requirement quoted above, it is clear that this was not a heightened strict-

---

knowingly engaged in the acts of using force and taking money (satisfying "general intent"), he did not intend permanently to deprive the bank of its possession of the money (failing to satisfy "specific intent").

Carter, 530 U.S. at 268 (citing United States v. Lewis, 628 F.2d 1276, 1279 (10th Cir. 1980)).

-34-

intent standard.

> Nonetheless, one of the dissenting Board members [in Matter of J-E-] accused the [BIA] of imposing a requirement that an alien "pro[ve] . . . an intent to accomplish a precise criminal act" and "the torture's [sic] specific intent to torture [the victim]." See Matter of J-E- at 315 (Rosenberg, L., dissenting). This is not what the majority concluded, given a full reading of its decision and the excerpts quoted above.

Appellee's Br. at 40. Not surprisingly, Auguste seizes on this statement, and argues that it merits reversal in this matter, stating that he finds "it difficult to believe that the [BIA] did not require a heightened specific-intent requirement" in Matter of J-E-. Appellant's Reply Br. at 15.

We see the source of the Government's concern. Standing alone, the problematic statement in Matter of J-E-, which the Government now disavows, could be read to impose a "heightened strict intent" or a "specific intent plus" standard. The statement can be broken down as follows: the Haitian authorities (1) intend the act of detaining deportees ("Haitian authorities are intentionally detaining criminal deportees knowing that the detention facilities are substandard") but (2) lack an intent to inflict severe pain and suffering ("there is no evidence that they are intentionally and deliberately creating and maintaining such prison conditions") and (3) lack an intent to inflict torture ("in order to inflict torture"). As the Government suggests, we think this last element goes too far and is not required under the specific intent standard. Section 208.18(a)(5) only requires that the act be specifically intended to inflict severe pain and suffering, not that the actor intended to commit torture. The two are distinct and separate inquiries.

However, we disagree with Auguste that this single troubling statement in Matter of J-E- renders the entire decision of the BIA in error. The statement should not be read out of context, and the rest of the opinion clearly indicates that the BIA

appropriately understood 8 C.F.R. § 208.18(a)(5) to require only specific intent to inflict severe pain or suffering, not anything more. See Matter of J-E-, 23 I. & N. Dec. at 297 (stating that "for an act to constitute 'torture' . . . the act must cause severe physical or mental pain or suffering [and] . . . be intentionally inflicted"); id. at 298 (quoting 8 C.F.R. § 208.18(a)(5) as requiring that "the act must be specifically intended to inflict severe physical or mental pain or suffering"); id. (noting that "the specific intent requirement is taken directly from the understanding contained in the Senate's ratification resolution"); id. (stating that "an act that results in unanticipated or unintended severity of pain or suffering does not constitute torture"); id. at 300 (determining that no conduct constituting "torture" took place based in part on the lack of evidence that "Haitian authorities are detaining criminal deportees with the specific intent to inflict severe physical or mental pain or suffering" (citing 8 C.F.R. § 208.18(a)(5)). Thus, we reject Auguste's contention that the BIA applied in Matter of J-E- a "heightened strict intent" or a "specific intent plus" standard.

## 4.

We must resolve one final issue before turning to the appropriate burden of proof. Auguste contends that this Court previously held in Zubeda v. Ashcroft, 333 F.3d 463 (3d Cir. 2003), that a showing of specific intent is not required under the Convention or its implementing regulations. In Zubeda, an alien successfully obtained relief from an order of removal under the Convention on the grounds that she would likely be subject to rape upon her return to the Democratic Republic of Congo ("DRC"). Zubeda introduced evidence tending to show that her family had been persecuted in the DRC, that members of her family had been brutally murdered, and that she had been gang-raped by soldiers. However, the BIA reversed, finding that the record did not support the immigration judge's finding that Zubeda would likely be detained if returned to the DRC, or that she would be targeted for harm by the soldiers of the Congolese government. In addition, the BIA likened the case to Matter of J-E-, noting that reported isolated instances of mistreatment that may rise to the level of torture do not establish that the alien herself was more likely than not to be

-36-

tortured.

Zubeda filed a petition for review to this Court, and we reversed. In particular, we were troubled by the cursory nature of the BIA's opinion and noted that the BIA "completely ignore[d] the basis of the Immigration Judge's decision." 333 F.3d at 475. For instance, we took issue with the BIA's assertion that the record did not support a finding that Zubeda would be likely detained upon her return to the DRC when the record clearly supported a contrary conclusion, a fact which the IJ had taken administrative notice of. Id. In addition, we held that the BIA erred when it relied on the IJ's adverse credibility finding, made in the context of Zubeda's asylum and withholding of deportation claims, to discredit her application for relief under the Convention. Id. at 476. We noted that because Zubeda's CAT claim was analytically separate from her other claims for relief, the BIA was required to provide a further explanation before relying on the IJ's adverse credibility finding. Id. Finally, we found the BIA's application of Matter of J-E- to Zubeda's CAT claim to be wholly unconvincing, noting that "[r]educing Zubeda's claim to an attack on the kind of inhumane prison conditions that formed the basis of the [BIA's] decision in Matter of J-E- totally ignores the fact that the record is replete with reports . . . that detail what appear to be systematic incidents of gang rape, mutilation, and mass murder." Id. at 477.

In addition to our criticisms of the BIA's opinion in Zubeda, we discussed at length whether "rape can constitute torture" when it is inflicted with the requisite intent, imposed for one of the purposes specified under the Convention, and inflicted with the knowledge or acquiescence of a public official with custody or control over the victim. Id. at 473. With regards to the intent element, we considered the applicable regulations and stated:

> Although the regulations [8 C.F.R. § 208.18] require that severe pain or suffering be 'intentionally inflicted, *we do not interpret this as a specific intent requirement* . . . . The intent requirement [under § 208.18(a)(5)] therefore distinguishes between suffering that is the accidental result of an intended act, and suffering that is purposefully inflicted or the

foreseeable consequence of deliberate conduct. However, *this is not the same as requiring a specific intent to inflict suffering*.

Id. at 473 (emphasis added). We proceeded to note that "requiring an alien to establish the specific intent of his/her persecutors could impose insurmountable obstacles to affording the very protections the community of nations sought to guarantee under the [Convention]." Id. at 474 (citation omitted).

We recognize that this portion of Zubeda is in tension with our holding in this case, that based on the ratification record of the CAT, the appropriate standard to be applied in the domestic context is the specific intent standard. However, we believe that the quoted passage of Zubeda, upon which Auguste relies, is dicta. The basis of our holding in Zubeda was limited to the defects in the BIA's reversal of the IJ's ruling that Zubeda was entitled to relief under the CAT. In fact, the INS agreed that, in light of these defects, "the most appropriate resolution [was] to remand to the Immigration Judge for clarification and additional evidence." Id. at 465. Our discussion of the specific intent standard in 8 C.F.R. § 208.18(a)(5) was not necessary to our finding of the defects in the BIA's opinion. Moreover, it does not appear that the meaning of the specific intent standard was challenged in that case, as there is no discussion of the United States' ratification history of the Convention, nor a discussion of the understandings submitted by the President and agreed to by the Senate. Thus, we decline to follow that portion of the Zubeda opinion that is dicta. See Ponnapula v. Ashcroft, 373 F.3d 480, 488 n.5 (3d Cir. 2004); United Artists Theatre Circuit, Inc. v. Township of Warrington, 316 F.3d 392, 397 (3d Cir. 2003).

## B. The Burden of Proof Required to Prove a Claim for Relief under the CAT

Auguste argues that the BIA erroneously set the burden of proof in 8 C.F.R. § 208.16(c)(2) to require an alien seeking relief under the Convention to show that it is "more likely than not" that he would be tortured upon removal, rather than the standard Auguste contends is required under Article 3 of the Convention,

which requires a showing of "substantial grounds for believing that he would be in danger of being subjected to torture." In particular, Auguste points to the drafting history of the Convention, which he argues shows that negotiators rejected a similar increased burden of proof on individuals seeking protection from torture. Moreover, Auguste points to several decisions of the Committee against Torture, an advisory body created by the Convention to monitor compliance with the terms of the treaty, that have used the "substantial grounds" standard of Article 3 in rendering opinions under the Convention. Because this involves a pure question of law, we have habeas jurisdiction over the issue. See Bakhtriger, 360 F.3d at 425.

We begin by noting that on several prior occasions, we have applied the "more likely than not" standard in evaluating claims for relief under the Convention. See, e.g., Berishaj v. Ashcroft, 378 F.3d 314, 332 (3d Cir. 2004); Wang v. Ashcroft, 368 F.3d 347, 348 (3d Cir. 2004); Mulanga, 349 F.3d at 132 (quotations omitted). Our prior uses of the "more likely than not" standard constitute precedent in this matter, and we are bound to apply the standard contained in 8 C.F.R. § 208.16(c)(2) to resolve Auguste's claim. See Third Circuit Internal Operating Procedure 9.1 ("It is the tradition of this court that the holding of a panel in a precedential opinion is binding on subsequent panels. Thus, no subsequent panel overrules the holding in a precedential opinion of a previous panel. Court en banc consideration is required to do so.").

Nor do we see any error in our prior decisions in this regard because it is plain that the "more likely than not" standard is the correct standard to be applied for CAT claims. The "more likely than not" standard has its origins in identical understandings submitted by Presidents Reagan and Bush with regards to Article 3 of the Convention, and adopted by the Senate in its resolution of ratification, stating that the "United States understands the phrase 'where there are substantial grounds for believing that he would be in danger of being subjected to torture,' as used in Article 3 of the Convention, to mean 'if it is more likely than not that he would be tortured.'" See Senate Resolution, supra, II.2. This standard was then codified into domestic law through § 2242(b) of FARRA, which directed the relevant agencies to adopt regulations

implementing the United States' obligations under the Convention "subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention." See 8 U.S.C. § 1231 note. Accordingly, in evaluating Auguste's claim that he is entitled to relief under the Convention, we must apply the "more likely than not" standard contained in 8 C.F.R. § 208.16(c)(2).[24]

### C.  Whether Auguste is Entitled to Relief on his Habeas Petition

### 1.

Auguste argues that, even if the BIA adopted the correct intent and burden of proof standards in the implementing regulations, he is nonetheless entitled to relief under the CAT. Auguste contends that he will be subject to indefinite detention upon his return to Haiti, that the conditions in Haitian prisons are deplorable, and that the Haitian authorities are not only aware that their imprisonment policy causes severe pain and suffering, but purposely place deportees in the deplorable conditions in order to punish and intimidate them.

We review de novo the District Court's denial of Auguste's habeas petition. See De Leon-Reynoso v. Ashcroft, 293 F.3d 633, 635 (3d Cir. 2002). However, because our evaluation of the merits of Auguste's habeas claim involves a review of the IJ's decision, which in turn relied on the BIA's decision in Matter of J-E-, our standard of review is far narrower because the BIA's interpretation and application of its own regulations is entitled to "great

---

[24]Because we find that the applicable burden of proof to be applied for CAT claims is the "more likely than not" standard, we do not reach Auguste's arguments that the Department of Justice improperly incorporated the burden of proof used in claims arising under Article 33 of the United Nations Convention Relating to the Status of Refugees, July 28, 1951, 19 U.S.T. 6223, 189 U.N.T.S. 150, or whether we should resort to the rule of lenity as an aid in interpreting the Convention.

-40-

deference." See Abdille v. Ashcroft, 242 F.3d 477, 484 (3d Cir. 2001). This deference "to the Executive Branch is especially appropriate in the immigration context where officials exercise especially sensitive political functions that implicate questions of foreign relations." Tineo, 350 F.3d at 396 (quoting Aguirre-Aguirre, 526 U.S. at 424).

**2.**

Before considering the merits of Auguste's habeas petition, we address an issue related to the scope of our habeas review. As we noted above, our review is limited to errors of law, such as the application of law to undisputed facts or adjudicated facts, but does not include review of administrative fact findings. Thus, as an initial matter, we must identify what the undisputed facts are in this matter, and what administrative fact findings were made by the IJ.

The IJ found the factual situation presented by Auguste's application for deferral of removal to be indistinguishable from the matter presented in Matter of J-E-. The IJ's oral decision states:

> Counsel for the respondent is not claiming here today that the situation in Haiti is somehow different from the situation that confronted the respondent in [Matter of J-E-] and that the Board had to consider in Matter of J-E-. So, we are dealing with essentially the same fact pattern, the respondent like the respondent in [Matter of J-E-] is a person from Haiti on the brink of deportation back to that country for criminal reasons, and the prison conditions are fundamentally the same today as they were just a year ago in Haiti, and so the claim is in this Court's view virtually the identical claim that was before the Board in Matter of J-E- both as a legal issue and in terms of the facts of the case.

(J.A. 46-47.) Thus, on habeas review, we are limited to the administrative factual findings of the IJ, which are essentially those that the BIA addressed in Matter of J-E-. In addition, the IJ found that, with regards to Auguste's predicament in particular, there was

-41-

no evidence (nor was there any submitted) that Auguste's situation differed in any way from the alien in Matter of J-E-, or that he had faced torture in Haiti in the past. The District Court, in considering Auguste's habeas petition, does not appear to have made any independent findings of fact in this matter and instead relied on the facts presented in Matter of J-E-. Thus, at a minimum, the administrative facts in this matter are the same as those in the factual record the BIA considered in Matter of J-E-.[25]

The Government, however, contends that Auguste has introduced evidence in his habeas petition that conflicts with the factual findings made by the BIA in Matter of J-E-, and that this constitutes an attack on fact findings inappropriate on habeas review. The specific facts in dispute include a statement by a Haitian government official that acknowledges that the conditions in the prisons are "tough," as well as a statement that the purpose of Haiti's imprisonment policy is to intimidate and punish deportees, and to teach them a lesson about the true conditions in Haiti's prisons. Even assuming that we agree with the Government that these statements somehow are in conflict with the findings of the BIA in Matter of J-E-, we nonetheless see no reason to decide the question of whether the foregoing statements offered by Auguste may be considered on habeas review because they do not, in our opinion, strengthen Auguste's CAT claim or change our ultimate disposition of his petition. Accordingly, although we will discuss these facts below, nothing in this opinion should be construed as a holding that the disputed facts are properly before

---

[25]The Government explains that the record before this Court is incomplete and does not include a copy of Auguste's pleadings before the IJ or the BIA. This is because the complete administrative record of the removal proceedings was not yet in evidence at the time the District Court denied the habeas petition on the merits. The only record we have is contained in the Joint Appendix, which contains the petition for writ of habeas corpus and attached exhibits, as well as an affidavit executed by counsel for Auguste with attached exhibits.

this Court.[26]

**3.**

"An applicant for relief on the merits under [Article 3] of the [Convention] bears the burden of establishing 'that it is more likely than not that he or she would be tortured if removed to the proposed country of removal.'" See Sevoian v. Ashcroft, 290 F.3d 166, 174-75 (3d Cir. 2002) (quoting 8 C.F.R. § 208.16(c)(2)). The standard for relief under the Convention "has no subjective component, but instead requires the alien to establish, by objective evidence, that he is entitled to relief." See id. (internal citations and quotations omitted); see also Elien v. Ashcroft, 364 F.3d 392, 398 (1st Cir. 2004); Cadet, 377 F.3d at 1180.

For an act to constitute torture under the Convention and the implementing regulations, it must be: (1) an act causing severe physical or mental pain or suffering; (2) intentionally inflicted; (3) for an illicit or proscribed purpose; (4) by or at the instigation of or with the consent or acquiescence of a public official who has custody or physical control of the victim; and (5) not arising from lawful sanctions. See Matter of J-E-, 23 I. & N. Dec. at 297 (citing 8 C.F.R. § 208.18(a)); see also Cadet, 377 F.3d at 1192 (outlining

[26]As an additional matter, in his Brief to this Court, Auguste relies in part on the 2003 State Department Country Report on Human Rights Practices for Haiti ("2003 Report") which was released on February 25, 2004. Because the IJ decided this case on November 12, 2003, the 2003 Report was not part of the administrative record on which the IJ based his finding that Auguste was not eligible for CAT relief. In contrast, it appears that the 2001 and 2002 State Department Country Reports were before the IJ. The Government contends that the 2003 Report is not properly before this Court. However, after reviewing the 2003 Report submitted as part of Auguste's habeas petition, we believe that it contains no new evidence that strengthens Auguste's claim or which would change our ultimate disposition of his habeas petition. Accordingly, we need not decide whether the 2003 Report is properly before this Court.

the same requirements); <u>Elien</u>, 364 F.3d at 398 (same). An "alien's testimony, if credible, may be sufficient to sustain the burden of proof without corroboration." <u>Zubeda</u>, 333 F.3d at 471-72 (citing <u>Mansour v. INS</u>, 230 F.3d 902, 907 (7th Cir. 2000)). "If an alien meets his/her burden of proof, withholding of removal under the Convention is mandatory just as it is for withholding of deportation under § 243(h)." <u>Zubeda</u>, 333 F.3d at 472 (citing INA § 241(b)(3) and 8 C.F.R. §§ 208.16 - 208.18).

We can discern at least three separate circumstances which Auguste contends constitute torture within the meaning of the Convention. First, Auguste contends that the indefinite detention of criminal deportees constitutes torture. Second, Auguste contends that the detention, coupled with the harsh and deplorable prison conditions, constitutes torture. Finally, Auguste contends that the fact that he may be subject to physical abuse and beatings by prison guards constitutes torture. We consider each in turn.

a.      Indefinite Detention

As we discussed above in Part I.A, the government of Haiti uses a preventive detention policy for criminal deportees. The State Department's 2000 Country Report on Human Rights Practices in Haiti, which was submitted to the District Court as an exhibit to Auguste's habeas petition, states:

> In the past, when the authorities received Haitian citizens deported from other countries for having committed crimes, they were generally processed in 1 week and then released. Since March 2000, criminal deportees who already have served sentences outside the country are kept in "preventive detention," with no fixed timetable for their eventual release. According to police officials, the deportees are held in order to prevent an increase in insecurity and to convince them that they would not want to risk committing crime because of prison conditions. The average period of preventive detention for these persons has decreased to approximately 1 month, compared to several months in 2000.

2000 Country Report.

The BIA found in <u>Matter of J-E-</u> as a factual matter that the Haitian government uses the detention procedure "to prevent the bandits from increasing the level of insecurity and crime in the country" and as a "warning and deterrent not to commit crimes in Haiti." <u>Matter of J-E-</u>, 23 I. & N. Dec. at 300 (internal citations and quotations omitted). The BIA also found that the detention policy "in itself appears to be a lawful sanction designed by the Haitian Ministry of Justice to protect the populace from criminal acts committed by Haitians who are forced to return to the country after having been convicted of crimes abroad." <u>Id.</u> Accordingly, the BIA concluded that the detention policy constituted a lawful sanction within the meaning of 8 C.F.R. § 208.18(a)(3), and was not otherwise intended to defeat the purpose of the Convention, and thus was not torture. <u>Matter of J-E-</u>, 23 I. & N. Dec. at 300.

Auguste, however, contends that the detention policy, whatever its deterrent purposes, is unlawful under Haiti's Constitution and criminal code and violates the international human rights law prohibition against indefinite and arbitrary imprisonment. Auguste, in effect, contends that whether a state policy is a lawful sanction within the meaning of 8 C.F.R. § 208.18(a)(3) hinges on the legality of that policy under the removal country's applicable law. This is undoubtedly an interesting but difficult issue.[27]

However, we note that in <u>Matter of J-E-</u>, the BIA made an alternative ruling why the policy of indefinite detention does not constitute torture, specifically that "there is no evidence that Haitian authorities are detaining criminal deportees with the specific intent to inflict severe physical or mental pain or suffering." 23 I. & N. Dec. at 300. As will be shown in the next section, we agree with that conclusion. Thus, even if we were to find that the detention

---

[27]The District Court in this matter, relying on the BIA's finding in <u>Matter of J-E-</u> that the detention policy constituted a lawful sanction within the meaning of 8 C.F.R. § 208.18(a)(3), apparently found no violation or challenge to Haitian law by the use of the detention policy.

policy was not a lawful sanction, we would conclude that the Haitian authorities lacked the requisite intent for a finding of torture. Thus, we see no need to address the lawful sanction issue arising under 8 C.F.R. § 208.18(a)(3) or be drawn into an inquiry as to the particularities of Haitian or international law on this matter.

## b. Prison Conditions

Auguste contends that his detention in harsh and brutal prison conditions constitutes torture. We briefly described these conditions above in Part I.A, and there is no doubt that these conditions are objectively deplorable. In Matter of J-E-, the BIA found from the record that the Haitian prison conditions were "the result of budgetary and management problems as well as the country's severe economic difficulties." Matter of J-E-, 23 I. & N. Dec. at 301. In addition, the BIA found that "although lacking in resources and effective management, the Haitian Government is attempting to improve its prison systems," and that the Haitian Government "freely permitted the ICRC [International Committee of the Red Cross], the Haitian Red Cross, MICAH [International Civilian Mission for Support in Haiti], and other human rights groups to enter prisons and police stations, monitor conditions, and assist prisoners with medical care, food, and legal aid." Id. (citations omitted). However, the BIA found that placing detainees in these prison conditions did not constitute torture because there was no evidence that the Haitian authorities had the specific intent to create or maintain these conditions so as to inflict severe pain or suffering on the detainees. Id. The District Court, relying on Matter of J-E-, agreed, concluding that "we have circumstances here where we have simply the allegation of general prison conditions in Haiti. So it does not appear to me that [Auguste] has made any showing that his pain and suffering or physical or mental injury would be intentionally inflicted." (J.A. 15.)

Auguste, however, challenges the conclusion of the District Court and the BIA in Matter of J-E- that the Haitian authorities do not have the requisite specific intent under 8 C.F.R. § 208.18(a)(5). He contends that the Haitian authorities are not only aware that their imprisonment policy causes severe pain and suffering, but

purposely place deportees in the brutal prison conditions in order to punish and intimidate them. The BIA's finding that the prison conditions are the result of budgetary and management problems is a factual finding that falls outside the scope of our habeas review. However, Auguste's contention that the BIA misapplied 8 C.F.R. § 208.18(a)(5) involves the application of law to facts and thus is appropriate on habeas review.

Keeping in mind the appropriate deference we must give to the BIA in the interpretation of its own regulations, we do not think the BIA acted outside of its authority or contrary to law in Matter of J-E- in concluding that the Haitian authorities lack the requisite specific intent to inflict severe pain and suffering on Auguste, or others like him, within the meaning of 8 C.F.R. § 208.18(a)(5). As we noted above, for an act to constitute torture, the actor must not only intend to commit the act but also intend to achieve the consequences of the act. In this case, the latter is lacking. As the BIA found in Matter of J-E-, the prison conditions, which are the cause of the pain and suffering of the detainees, result from Haiti's economic and social ills, not from any intent to inflict severe pain and suffering on detainees by, for instance, creating or maintaining the deplorable prison conditions. The mere fact that the Haitian authorities have knowledge that severe pain and suffering may result by placing detainees in these conditions does not support a finding that the Haitian authorities intend to inflict severe pain and suffering. The difference goes to the heart of the distinction between general and specific intent.

In effect, Auguste is complaining about the general state of affairs that exists in Haitian prisons. The brutal conditions are faced by all prisoners and are not suffered in a unique way by any particular detainee or inmate. We think it goes without saying that detainees and other prisoners face a brutal existence, experiencing pain and suffering on a daily basis. The conditions that we have described are among the worst we have ever addressed. But, the pain and suffering that the prisoners experience in Haiti cannot be said to be inflicted with a specific intent by the Haitian government

within the meaning of 8 C.F.R. § 208.18(a)(5).[28]

In so holding, we caution that we are not adopting a per se rule that brutal and deplorable prison conditions can never constitute torture. To the contrary, if there is evidence that authorities are placing an individual in such conditions with the intent to inflict severe pain and suffering on that individual, such an act may rise to the level of torture should the other requirements of the Convention be met. Perhaps, as evidence is further developed on conditions in Haiti, the BIA may arrive at a different conclusion in the future. But, the situation that we are presented with, and the evidence that we must consider, do not support a finding that Auguste will face torture under the only definition that is relevant for our purposes – the definition contained in the Convention and the implementing regulations.

<u>c.</u>      <u>Physical Abuse</u>

Finally, Auguste points to reports of physical beatings of prisoners by prison guards as evidence that he faces torture upon his removal to Haiti. In <u>Matter of J-E-</u>, the BIA noted that the reports of prisoner abuse have ranged from the beating with fists, sticks and belts to burning with cigarettes, choking, hooding, and kalot marassa. 23 I. & N. Dec. at 302. In <u>Matter of J-E-</u>, the BIA

---

[28]Although we do not think that the following list, contained in the record of the ratification of the Convention by the Senate, was intended to be exhaustive, we think the illustrative list of the acts which could constitute torture supports our analysis of the specific intent requirement of 8 C.F.R. § 208.18(a)(5):

> The term 'torture,' in United States and international usage, is usually reserved for extreme, deliberate and unusually cruel practices, for example, sustained systematic beating, application of electric currents to sensitive parts of the body, and tying up or hanging in positions that cause extreme pain.

<u>See</u> S. Exec. Rep. 101-30, at 14 (citations omitted).

concluded that, although such acts may rise to the level of torture, the alien there had failed to meet his burden of proof that he would be more likely than not subject to torture. Id. at 302-03. In particular, the BIA noted that there were no claims by the alien of past torture. Id. at 303. Moreover, although there were reported instances of beatings of prisoners, the alien had failed to show that the beatings were "so pervasive as to establish a probability that a person detained in a Haitian prison will be subject to torture." Id. at 304. The situation here is no different. Auguste has not alleged any past torture, nor has he offered any evidence tending to show that he faces an increased likelihood of torture anymore than the alien in Matter of J-E-.

## IV. CONCLUSION

The conditions that Auguste will likely face in Haiti's prisons, like those awaiting many other criminal deportees, are harsh and deplorable. However, in ratifying the Convention against Torture, the United States undertook its obligations subject to certain understandings on the proper intent and burden of proof standards. The Department of Justice thereafter adopted regulations that properly implemented those standards in the regulations governing CAT claims. Auguste has not satisfied those standards. Accordingly, we will affirm the order of the District Court.